Bashir HAMEED, a/k/a James York, Plaintiff–Appellant,

v.

Louis MANN, Superintendent, Shawangunk Correctional Facility; M. McGinnis, Captain, Green Haven Correctional Facility; Donald Selsky, Director of Special Housing and Inmate Disciplinary Programs, Department of Correctional Services; and Thomas A. Coughlin III, Commissioner, Department of Correctional Services, Defendants–Appellees.

No. 984, Docket 94–2296.

United States Court of Appeals, Second Circuit.

Argued April 13, 1995.

Decided June 15, 1995.

Kenneth R. Stephens, Poughkeepsie, NY (Deborah S. Schneer, David C. Leven, Prisoners' Legal Services, Poughkeepsie, NY, on the brief), for plaintiff-appellant.

Meredith Savitt, Asst. Atty. Gen., Albany, NY (G. Oliver Koppell, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., Albany, NY, on the brief), for defendants-appellees.

Before: FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Bashir Hameed, a New York State prisoner, appeals from a final judgment of the United States District Court for the Northern District of New York following a jury trial before Thomas J. McAvoy, *Chief Judge,* dismissing his complaint challenging the constitutionality of New York State ("State") Prison Disciplinary Rule 104.12 and seeking damages under 42 U.S.C. § 1983 (1988) against several State corrections officials for violation of his constitutional rights

in connection with a disciplinary hearing. On appeal, Hameed pursues his constitutional claims and contends that he was denied a fair trial because, *inter alia*, the district court required him to remain shackled during trial. Finding in his contentions no basis for reversal, we affirm. We write principally to discuss the issue of shackling.

## I. BACKGROUND

In 1988, Hameed, having been convicted of murder, was incarcerated at Shawangunk Correctional Facility ("Shawangunk"). He was placed in the Close Supervision Unit ("CSU"), a housing area for prisoners identified as requiring more careful monitoring than the general prison population.

### A. The Administrative Proceedings

Beginning in early October 1988, approximately 50 inmates housed in CSU engaged in protests by, *inter alia*, refusing to attend their work programs. Some days after the protests began, defendant Louis Mann, Shawangunk's superintendent, directed that misbehavior reports be issued to the inmates involved. To process all the misbehavior reports, a number of officers, including defendant M. McGinnis, were brought from other prisons to Shawangunk. Prior to any of the hearings, Mann held a briefing for the outside hearing officers during which he gave them an overview of the events.

In mid-October, Hameed was issued a misbehavior report charging him with a violation of Rule "104.12[:] Inmate shall not lead, organize, participate or urge other inmates to participate in work stoppage, sit-ins, lock-ins, or other action which may be detrimental to the order of the facility." The report alleged that

> [b]eginning with the A.M. program period on Wednesday 10/5/88 and through Friday, 10/7/88 this inmate and all other inmates in housing unit B–2 refused to participate in normal program assignments. He did so by locking in his cell and refusing to leave during program periods.

Hameed's hearing was held before McGinnis. Hameed argued, *inter alia*, that he could not have participated in the work stoppage because at the time in question he was on medical keeplock and hence could not work. Sergeant Clare Armstrong, the officer who authorized the issuance of the report against Hameed, testified that she believed Hameed was a leader of the demonstrations because she had seen him flick his lights and give hand signals in the mess hall and make what she interpreted as group demands.

McGinnis found Hameed guilty of the alleged misbehavior, concluding that he was a leader in the incident. Hameed was sentenced principally to one year of punitive confinement. He filed an administrative appeal, which was denied by defendant Donald Selsky, who had been designated by defendant Thomas A. Coughlin, Commissioner of the State's Department of Correctional Services ("DOCS"), to hear such appeals.

### B. The Proceedings in the District Court

Hameed commenced the present action against Mann, McGinnis, Selsky, and Coughlin in 1989, asserting due process and First Amendment claims. The complaint challenged Rule 104.12 as unconstitutionally vague and alleged that because the language of the misbehavior reports issued to all of the CSU inmates was the same, Hameed had not been given sufficient notice of the conduct with which he was charged. It also alleged that Mann and McGinnis had deprived Hameed of legal assistance and an opportunity to interview witnesses and obtain documents in preparation for the hearing, and that the prehearing communications by Mann to McGinnis deprived Hameed of an unbiased hearing officer. The complaint alleged that Selsky and Coughlin had deprived Hameed of due process by adopting and ratifying the decision of McGinnis.

Prior to trial, Hameed's attorney asked the trial court to permit Hameed to be freed from physical restraints while in the presence of the jury. In a decision discussed in greater detail in part II.A. below, the court denied that request. Hameed appeared at trial and testified wearing handcuffs, which were locked to a waist chain, and leg-irons.

Most of the defendants also testified. The evidence included the testimony of McGinnis that he never had discussions with anyone

about the outcome of any particular hearing or the decision he would make.

At the close of the evidence, the district court dismissed the complaint against Coughlin on the ground that there was no evidence of his personal involvement; it dismissed the complaint against Selsky on the ground that, as an appellate hearing officer, he had absolute immunity against Hameed's suit. Hameed's other claims were submitted to the jury in a detailed set of interrogatories.

The jury found, *inter alia*, that Hameed had not established by a preponderance of the evidence (a) that the notice given him was inadequate, (b) that he was denied the ability to interview potential witnesses or obtain documentary evidence, or (c) that he was denied a fair hearing by prehearing communications from Mann to McGinnis or by the fact that McGinnis presided over a number of similar hearings. Further, though the jury found that Hameed had engaged in activity protected by the First Amendment, it found that he had failed to establish that either the bringing of the charges against him or the severity of the penalty imposed on him was in retaliation for that protected activity. Having found that Hameed failed to prove all of the elements needed to establish liability on any of his claims, the jury was not required to reach questions as to damages.

A final judgment was entered dismissing the complaint. The court denied a subsequent motion by Hameed to set aside the verdict on the principal grounds that he was entitled to judgment as a matter of law on the constitutional issues or to a new trial on the basis that the jury's verdict was against the weight of the evidence. This appeal followed.

## II. DISCUSSION

On appeal, Hameed pursues his challenges to the constitutionality of Rule 104.12 and to the fairness of the administrative proceedings. He also challenges the dismissals of Selsky and Coughlin and alleges that he was denied a fair trial because of various alleged trial errors and because of the pretrial order requiring him to remain shackled during trial. We find no basis for reversal in any of

his contentions. Only the last warrants extended discussion.

### A. *The Imposition of Physical Restraints*

Just prior to trial, defense counsel requested that Hameed be freed from physical restraints while in the presence of the jury. The court denied that request:

THE COURT: .... [W]e began a discussion off the record, which now we should have on the record, with respect to how restrained the plaintiff should be in terms of leg shackles, hand cuffs, black box, all the things that the prison officials have for transporting, dealing with prisoners when they are outside the confines of the institution and plaintiffs [*sic*] have made it clear that they believe it would be severely prejudicial to the plaintiff's case were he to appear fully restrained in the courtroom in front of the jury. And I'm going to let them state their own position on the record, then we'll hear what defendant [*sic*] has to say and I'll tell everybody what I told them before.

MR. STEPHENS [Attorney for Hameed]: Yes, your Honor. In this case we believe that having the plaintiff appear before the jury in any kind of restraints will be prejudicial to his ability to obtain a fair trial. I think that it's the Court's duty to balance any security needs with plaintiff's rights to a fair trial regarding this particular plaintiff. I would want to make record of the fact that he was in Queens County Supreme Court last year, a hearing involving his criminal conviction in which no shackles at all were required and I have an affidavit from his attorney who represented him at that time to that effect. There were no outbursts in the courtroom and that basically it was conducted with the level of decorum that I'm sure you would find acceptable in this courtroom.

MS. SAVITT [Assistant Attorney General, representing defendants]: Well, we don't believe there would be any prejudice of Mr. Hameed being shackled in this case. As Judge McAvoy alluded to, the jury will be well aware he's been convicted of a crime, what he's been convicted of and the nature of it. We would defer to the exper-

tise of the corrections officials and to the discretion of Judge McAvoy on this issue.

THE COURT: All right. Well, first of all, unbeknownst to any of you people, I received a lot of ex-parte information from corrections department or some place—I don't know where it came from—showing how, what a terrible gentleman the plaintiff was and the deeds he committed in the years gone on, I guess in the black militant group, killing a police officer in short of [sic] a walk-by shooting and severely wounding another officer. And apparently that information was to convince the Court that he, indeed, is in [sic] danger and still maintains his posture while in prison, although I've been advised by defense counsel now he's got a pretty good disciplinary record while in prison.

. . . . I've had no evidence here that Mr. Hameed is going to be disruptive at all, except from his past history and materials that were sent to me. My policy basically is, and I intend to follow at this time with some modifications, is that I defer, I don't pass my discretion on, I don't want this record to in any way reflect that, because I am exercising my discretion in this matter. But in order to exercise that I have to rely on people who have far more expertise than I do in the handling of prisoners, and as I indicated before off the record, it all depends upon a lot of factors. The severity of the crimes involved, any connections he might have with outside people. I'm told he still has connections with people in the community who might cause a problem. Question of a possibility of escape. All of those things have to be considered along with the fact that on a prior occasion he exhibited some decorum in Queens Supreme Court and he's got a generally good record as far as discipline in the institution is concerned. And after hearing the input of the corrections department officials, the Court feels that the wisest course and the safest course for all of those concerned, even keeping in mind the fact that a jury might be swayed in some fashion, the Court will, of course, give any limiting instruction that's reasonable, at counsel for plaintiff's suggestion, the Court's going to order that he remain shackled in the court-room. How much the Court has directed, and will modify that if it's necessary in some respect, that any restraints, as far as his wrists and hands are concerned are reasonable so that he can write and extend his arms and hands and things of that nature which I've done before.

. . . .

MR. STEPHENS: . . . . [F]or the record, I would just like to, I guess, preserve an objection to the submission of any ex-parte information on this particular issue.

THE COURT: Well, I don't think it's an issue, that's something the jury will ever hear about in terms of my decision. It's a preliminary issue and I think that the matter was submitted to me with being mindful of the safety of the public and the Court and the Court staff and personnel. I really don't think it was out of place. Somebody started submitting to me matters that had some bearing on the incident that occurred and we were going to try— by golly, you'd known about it in two minutes. This is sort of a preliminary type of thing that goes to how we have to handle the matter from the public safety standpoint. . . . .

(Hearing Transcript, October 26, 1993 ("Tr."), at 3–7.) After hearing a plea from Hameed himself that shackling in the court-room would be unnecessary and highly prejudicial, the court adhered to its decision:

THE COURT: . . . . The Court has balanced all the factors involved and recognizes that, according to your counsel, that during your prison stay, your disciplinary record has not been filled with acts of violence and that you did appear at a prior hearing unfettered and acted with some decorum and the Court's going to take that into consideration also and has. But as I indicated to your counsel, I'm not an expert in matters of the way you treat people who are confined. So, what I do is defer at least as far as getting my—

THE PLAINTIFF: Yes.

THE COURT:—expert opinions submitted to me upon which I can base a judgment along with everything else that I have to consider. I'm given to understand that,

first of all, had you [*sic*] a pretty violent start and that, secondly, there is [*sic*] some contacts you may have maintained on the outside and there is pretty, pretty good reason to maintain a fairly high degree of security including restraining you. And I realize that a jury may look at that, and I also realize that a jury's going to know why we are here and what we are doing and why you're here and I have indicated to your counsel that I would give any kind of a limiting instruction that would be appropriate with regard to this....

(*Id.* at 9–10.) The court ordered the guards to relax the restraints only to the extent of lengthening the chain by which Hameed's handcuffs were attached to his waist chain.

On appeal, Hameed contends that the court's refusal to allow him to appear before the jury unfettered denied him due process and requires that he be given a new trial in light of this Court's recent decision in *Davidson v. Riley*, 44 F.3d 1118 (2d Cir.1995). Though we view the district court proceedings as flawed, the circumstances are quite distinguishable from those in *Davidson*, and we conclude that any error here was harmless.

■■■ In *Davidson*, which was decided subsequent to the rulings at issue in the present case, we discussed the due process principles governing a district court's decision as to whether a party should be subjected to physical restraints in the presence of the jury. The trial court has discretion to order physical restraints if the court has found those restraints necessary to maintain safety or security. If manacles and other shackles are not necessary, forcing a party to appear in such restraints may well deprive him of due process. In determining what restraints are necessary, the court cannot properly delegate that decision to guards or other prison officials but must decide that question for itself. If there is a dispute as to the record on which the security questions are to be determined, the court should be willing to receive evidence. The court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints. *See* 44 F.3d at 1122–24. *See also*

*Lemons v. Skidmore*, 985 F.2d 354, 356–59 (7th Cir.1993); *Holloway v. Alexander*, 957 F.2d 529, 530 (8th Cir.1992); *Tyars v. Finner*, 709 F.2d 1274, 1285 (9th Cir.1983).

■■■ When the trial court has followed the proper procedures, its decision is reviewable for abuse of discretion. If the court has deferred entirely to those guarding the prisoner, it has failed to exercise its discretion. *See, e.g., Davidson v. Riley*, 44 F.3d at 1124; *Lemons v. Skidmore*, 985 F.2d at 358. If there has been such a failure, or if the court has abused its discretion, harmless-error analysis applies. *See, e.g., Davidson v. Riley*, 44 F.3d at 1124; *Lemons v. Skidmore*, 985 F.2d at 359; *Tyars v. Finner*, 709 F.2d at 1286; *cf. Estelle v. Williams*, 425 U.S. 501, 506–07, 96 S.Ct. 1691, 1694–95, 48 L.Ed.2d 126 (1976) (citing with apparent approval the rule, followed in the courts of appeals, that requiring a defendant to appear at a criminal trial in prison clothing is subject to harmless-error analysis). In determining whether an unnecessary imposition of restraints was harmless, we weigh several factors, including the strength of the case in favor of the prevailing party and what effect the restraints might have had in light of the nature of the issues and the evidence involved in the trial.

The *Davidson* appeal presented a number of problems. The principal error was that the district judge had deferred entirely to the views of those guarding Davidson that continued restraints were necessary. Further, it appeared that some of the guards' views were based on purported events that the state courts had ordered expunged from Davidson's record and had forbidden prison officials to use against him; the court made no effort to evaluate the guards' statements and ignored Davidson's detailed proffers and documents with regard to the state-court expungements. In addition, the plaintiff in *Davidson* appeared *pro se*, and some of the court's procedures multiplied the occasions on which he was required to hobble about the courtroom, thereby emphasizing his shackling; and the court apparently gave no cautionary instruction to the jurors to disregard Davidson's restraints as they considered the merits of his case.

In the present case, in contrast, it does not appear that the district court delegated its responsibility to the DOCS personnel. Though the court plainly indicated that it relied heavily on the expertise of the prison personnel, it also indicated that the ultimate decision was that of the court. Thus, though the district judge stated that his "policy basically" was to defer to DOCS officials, he went on to say that he was modifying that policy in the present case, "because I am exercising my discretion in this matter." (Tr. at 5.) He stated, "what I do is defer at least as far as getting. . . . expert opinions submitted to me upon which I can base a judgment along with everything else that I have to consider." (Tr. at 10.) "[I]t all depends upon a lot of factors. The severity of the crimes involved, any connections he might have with outside people. I'm told he still has connections with people in the community who might cause a problem. Question of a possibility of escape." (Tr. at 5.) The court stated that it had balanced all of the factors and concluded that "there is pretty, pretty good reason to maintain a fairly high degree of security including restraining you." (Tr. at 10.) We conclude that the court did not attempt to delegate its responsibility.

We have greater difficulty with the court's exercising its discretion in apparent reliance on evidence to which Hameed was not privy. The record indicates that among the ex parte documents on which the court relied were a telephone message and a 10–page fax from a correction official. The telephone message stated that Hameed was an extreme escape risk, that he had killed police officers, and that he was a member of the Black Liberation Army. The fax contained newspaper articles from the time of Hameed's arrest and conviction and a flyer calling for community support at one of Hameed's hearings. We see no reason why these documents, unsealed by this Court without objection in connection with the present appeal, should not have been disclosed to Hameed in the district court. However, we note that although Hameed's attorney objected to the court's receipt of ex parte communications, the record does not indicate that he asked to see what the court had received.

The major flaw here was that, on the question of whether Hameed was a "danger," the court received ex parte communications that the court itself had difficulty identifying: "unbeknownst to any of you people, I received a lot of ex-parte information from corrections department or some place—I don't know where it came from. . . ." (Tr. at 4.) A court must of course be concerned for the safety of the jurors, court personnel, persons attending the trial, and the public at large, and we reject Hameed's attorney's suggestion that ex parte communications as to security needs can never be appropriate. But it is inappropriate for a court to base its decision on information whose source it does not know. Assuming that the transcript accurately reflects what the district court meant to say, we conclude that to the extent the court relied on unknown sources in arriving at its conclusion that restraints were necessary, it erred.

We nonetheless conclude that any error here was harmless. First, the court identified the factors it considered, and it does not appear that any of those factors was disputed. There was no question as to the nature of the crime of which Hameed had been convicted; nor was there any request for an evidentiary hearing as to his contacts with persons who remained outside of prison.

Second, as to any likely prejudice at trial from Hameed's remaining shackled in the presence of the jury, we note that Hameed, unlike the plaintiff in *Davidson*, was not proceeding *pro se*, and so did not have to parade his restraints before the jury as obviously as did Davidson. Further, since the misbehavior report centered on an uprising in CSU, which was a unit for prisoners requiring more intensive monitoring than the general prison population, the jury would have been aware in any event that Hameed was regarded as requiring extra security.

Moreover, the need for additional security precautions was not material to the substance of Hameed's claims, which alleged principally the deprivation of procedural due process. The jury was unlikely to view the presence of physical restraints as bearing on the merits of allegations such as inadequacy of notice and denial of access to documents.

Nor did most of the issues hinge on Hameed's credibility. Though there were some credibility questions, such as whether to credit McGinnis's testimony as to the content of his conversations with Mann, and whether to credit Hameed's testimony as to his claimed emotional distress, a damages issue, there was little in the nature of a swearing contest in which a jury is required to choose between contradictory firsthand versions of a single event. Finally, we note that here, unlike in *Davidson,* the court repeatedly indicated its willingness to give the jury any appropriate cautionary instruction that Hameed's attorneys might request.

We conclude, in all the circumstances, that any error in the district court's determination that Hameed should remain shackled was beyond a reasonable doubt harmless.

B. *Other Contentions*

Hameed contends that the district court should have granted his motion for judgment as a matter of law on his constitutional claims of vagueness, inadequate notice, denial of assistance in defending the charge against him, and denial of access to evidence with which to defend the charge. We disagree and reject those contentions substantially for the reasons stated in Chief Judge McAvoy's Memorandum–Decision and Order dated April 26, 1994.

We also conclude that the district court properly dismissed the complaint against Coughlin because he was not shown to have any personal involvement in the events at issue here. Hameed's reliance on *Patterson v. Coughlin,* 905 F.2d 564, 568 (2d Cir.1990), is inapposite because that case merely upheld a district court's factual determination that Coughlin had been personally involved in the proceeding at issue there.

As to the dismissal of the complaint against Selsky, we also affirm, albeit not on the ground adopted by the district court. The district court dismissed the complaint against Selsky on the ground that he was entitled to absolute immunity. Thereafter, in *Young v. Selsky,* 41 F.3d 47 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1837, 131 L.Ed.2d 756 (1995), we held that a prison appellate hearing officer is not entitled to absolute immunity from a claim of constitutional defects in a prison hearing proceeding, though he may be entitled to qualified immunity. *See also Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (per curiam). In the present case, Hameed contended that Selsky was liable for failing to correct the alleged violations by Mann and McGinnis of Hameed's rights in the conduct of the hearing. Since we have found no basis for overturning the jury's verdict that Hameed failed to establish any violations by Mann or McGinnis, Selsky is entitled to judgment dismissing the claims against him as a matter of law.

Hameed also contends that the trial court erred in, *inter alia,* making certain evidentiary rulings, allocating the burden of proof, and instructing the jury. We have considered these contentions and conclude that they lack merit and do not warrant discussion.

CONCLUSION

We have considered all of Hameed's arguments on this appeal and have found in them no basis for reversal. The judgment dismissing the complaint is affirmed.